*Schmidt v. Creedon, et al.*
**No. 1:09-CV- 0323 (M.D.Pa.)**

# EXHIBIT I
*Arbitration Opinion and Award for Suspension*



EXHIBIT

I

3507

# PENNSYLVANIA BUREAU OF MEDIATION

In the Matter of Arbitration Between the

**COMMONWEALTH OF PENNSYLVANIA,
DEPARTMENT OF GENERAL SERVICES,**

"Public Employer,"

and

**CAPITOL POLICE LODGE NO. 85,
FRATERNAL ORDER OF POLICE,**

"Union."

**OPINION
AND
AWARD**

Greivance - #6741 (Michael Schmidt)

**Before
Robert C. Gifford, Esq.
Arbitrator**

**Appearances:**

**For the Employer:**
Patricia J. Goldband, Senior Counsel
Office of Administration

**For the Union:**
Sean T. Welby, Esq.,
Lightman Welby Stoltenberg & Caputo

The Commonwealth of Pennsylvania [the "Commonwealth" or "Employer"] and Fraternal Order of Police Lodge No. 85 (Capitol Police) [the "FOP" or "Union"] are parties to a collective bargaining agreement [the "Agreement"] effective July 1, 2003 through June 30, 2007. [Ex. J-1]. On July 18, 2006, the Commonwealth suspended Capitol Police Officer Michael Schmidt ["Schmidt" or "Grievant"] without pay pending further investigation of an incident in which the Grievant was allegedly involved. The Union submitted the matter to the Pennsylvania Bureau of Mediation ["Bureau"] for binding arbitration in accordance with the Agreement and the rules of the Bureau. I was designated to serve as arbitrator.

An arbitration hearing was held in Harrisburg, Pennsylvania on February 15, 2007. At the hearing, the parties were afforded the opportunity to argue orally, examine and cross-examine witnesses and submit documentary evidence into the record. Sworn testimony was received from Robert J. Rapak – Special Investigator. Connie A. Tennis – Chief of Labor Relations, Bureau of Human Resources, Department of General Services, Richard S. Shaffer – Superintendent, Gregory A. Green – Director of the Bureau of Human Resources, Department of General Services. Both parties submitted post-hearing briefs in March 2007. Counsel for both parties consented to my request for an extension of time to render my Opinion and Award for this matter.

1

## ISSUE

The parties gave me the authority to determine the framing of the issue(s) after they were unable to on their own. The Commonwealth proposes the following issues:

> 1. To the extent that no final determination regarding discipline has been made and to the extent that the grievance alleges violations of the Pennsylvania Administrative Agency Law and the United States Constitution, is the grievance arbitrable?
>
> 2. If the grievance is arbitrable, did the Commonwealth take reasonable administrative action in suspending Capitol Police Officer Michael Schmidt, pending the outcome of an investigation into alleged on-duty misconduct?

The Union proposes the following:

> Whether the Commonwealth violated Article 26 Section 1 of the collective bargaining agreement when it suspended the Grievant without just cause, and if not, what should the remedy be?

Having considered all of the evidence I frame the issue as follows:

> If the grievance is arbitrable, did the Commonwealth violate Article 26 Section 1 of the collective bargaining agreement when it suspended Capitol Police Officer Michael Schmidt without pay pending an investigation into the alleged on-duty misconduct? If so, what shall be the remedy?

2

## RELEVANT CONTRACTUAL PROVISIONS

### ARTICLE 26
### DISCHARGE, DEMOTION, SUSPENSION AND DISCIPLINE

Section 1 The Employer shall not demote, suspend, discharge or take any disciplinary action against an officer without just cause. An officer may appeal a disciplinary demotion, suspension, or discharge beginning at the second step of the grievance procedure under Article 27. The FOP shall be notified promptly of any disciplinary demotion, suspension or discharge. The failure of the Employer to comply with the preceding notification requirements will not affect the validity of the action, but will suspend the time period set forth in Step 2 of Section 2 of Article 27, Grievances and Arbitration, until the notification is sent.

* * *

### ARTICLE 27
### GRIEVANCES AND ARBITRATION

Section 1 Where an officer has the right to process a grievance through either the procedure provided herein or through the Pennsylvania Civil Service Commission and files an appeal with the Commission, either the contract grievance procedure shall cease, if the officer has submitted a contract grievance, or the officer shall not be entitled to institute proceeding under the contract grievance procedure. If the appeal to the Commission is withdrawn by the officer or not accepted by the Commission within 15 working days of the date of the occurrence of the action giving rise to the grievance, the processing of a contract grievance filed within the time limits set forth in Section 2 shall be permitted.

Section 2 Any grievance or dispute which may arise concerning the application, meaning or interpretation of this Agreement shall be settled in the following manner:

* * *

3

Each case shall be considered on its merits and the collective bargaining agreement shall constitute the basis upon which the decision shall be rendered. The decision at Step 1 shall not be used as a precedent for any subsequent case.

The arbitrator shall neither add to, subtract from, nor modify the provisions of this Agreement. The arbitrator shall confine himself/herself to the precise issue submitted for arbitration and shall have no authority to determine any other issues not so submitted.

• • •

## BACKGROUND

The Capitol Police is a Division of the Bureau of Police and Safety – one (1) of nineteen (19) Bureaus within the Commonwealth of Pennsylvania's Department of General Services. As a law enforcement agency, the Capitol Police's statutory jurisdiction includes the Capitol Complex in Harrisburg and Commonwealth facilities in Pittsburgh, Philadelphia and Scranton. The Capitol Police is lead by Superintendent Richard S. Schaffer and Deputy Superintendent Robert J. Dillard.

The Capitol Police and approximately twenty (20) local law enforcement agencies utilize for law enforcement purposes a data base system known as the Metro Dispatch System ["METRO"]. The Commonwealth's brief provides a good description of the METRO:

4

> This data base includes dispatches, police reports, citations
> and other records. It may be accessed only by authorized
> users who sign-on with a distinctive user ID and password.
> One of the features of Metro is that it can be searched via an
> alphabetical name search.   In a Metro dispatch, an
> individual may . be "typed" as "suspect", "accused",
> "complainant", "reported by", "witness", "victim" or "other"
> (Commonwealth Exhibit 1). If an individual is named as
> "accused" in Metro, he or she may be detained by a police
> officer. [Employer Brief, p. 2].

Robert Rapak is a Special Investigator in the Capitol Police's Office of
Professional Responsibility. One of Rapak's duties as a Special Investigator is to
perform internal investigations of alleged misconduct of Capitol Police officers.
During his testimony at the arbitration hearing, Rapak indicated that he
received a telephone call at home from Capitol Police Sergeant Bistline on the
morning of Saturday, July 15, 2006. According to Rapak, Bistline informed him
that the Grievant and a Capitol Police Sergeant may have entered into the
METRO criminal allegations of harassment and obstruction of justice against
Rapak. Superintendent Shaffer, and Deputy Superintendent Dillard.   Rapak
instructed Bistline to secure a print-out of the METRO information.   The
information was delivered to Rapak at his home either that day or on Sunday,
July 16, 2006.

On Monday, July 17, 2006, Rapak reported for duty. Rapak testified that
although he was neither instructed nor ordered to perform an internal
investigation he, as part of his duties to conduct internal investigations. inquired

5

into whether the allegations above had support. To that end, he reviewed the METRO dispatch statement and a report from Bistline. He confirmed the Grievant's user ID for the METRO. [See Ex. C-2]. He also determined that the Grievant was assigned to the 0700-1500 shift on July 15, 2006 at the Rachel Carson State Office Building. According to Rapak, he did not perform interviews because he was not conducting a full investigation as he was named in the METRO dispatch statement as one of the accused and was concerned that the investigation would be compromised by his involvement. Rapak discussed the information he obtained with Superintendent Shaffer that morning but received no direction with regard to the matter. Rapak testified that he eventually provided the DGS Office of Human Resources with the information he compiled.

Connie A. Tennis is the Chief of Labor Relations, Bureau of Human Resources, Department of General Services. Tennis testified that she received a telephone call from Superintendent Shaffer in which he requested a meeting. On July 18, 2007, Tennis met with Shaffer, Rapak, and possibly Deputy Superintendent Dillard at which time she was provided with the information Rapak gathered. Tennis testified that they informed her that, on July 15, 2006, the Grievant abandoned his post, entered an unauthorized area, and accessed the METRO dispatch without following the proper procedures. Tennis indicated that based upon the documentation Rapak gathered and the seriousness of the allegations against the Grievant, the situation raised concerns of trust.

6

Therefore, the conclusion to suspend the Grievant pending investigation was drawn. Tennis testified that the matter was referred to the Office of Inspector General for investigation and a report.

Superintendent Shaffer testified that he spoke with Rapak on July 17, 2006, and requested Rapak to gather information regarding the July 15, 2006 incident. Shaffer testified that he called Human Resources and requested a meeting. On July 18, 2006, Shaffer met with Tennis, Rapack, and Gregory Green, the Director of Human Resources, Department of General Services, whereupon the information Rapak gathered was presented to Tennis and Green. Shaffer testified that Rapak explained the information he gathered to Tennis and the concerns he had regarding the Grievant's conduct. Shaffer indicated Tennis and Green were advised that the Grievant did not follow the proper procedures.

Director Green testified that the information he received at the July 18, 2006 meeting provided the Commonwealth with reason to suspend the Grievant without pay pending an investigation pursuant to the collective bargaining agreement. Green acknowledged that he did not review any rule, regulation, policy or procedure before the decision was made. Green, however, considered the information he received in the context of an officer's duties. Green testified that Capitol Police Officers are expected to man their

7

posts, obey orders, and follow proper procedures. Green indicated that Shaffer

and Rapak advised him that the information Rapak gathered was confirmed by

Bistline.  Green testified that he relied upon the representations Shaffer and

Rapak made during the meeting, and that the decision to suspend the Grievant

without pay pending the investigation was made after the meeting.

On July 18, 2006, the Commonwealth suspended the Grievant without

pay pending further investigation. Bureau of Human Resources Director Gregory

A. Green, on behalf of James P. Creedon, Secretary of General Services, wrote

the following letter to the Grievant:

> This is to advise you that you are being suspended
> without pay from your position of Capitol Police Officer
> (Patrolman), regular Civil Service status, pending further
> investigation, effective at the close-of-business on July 18,
> 2006. The period of this suspension will not exceed 60 working
> days and cannot be charged to annual, sick, personal,
> holiday, compensatory or other leave.
>
> The reason for this suspension is that you allegedly were
> involved in the entry of information into the "METRO" system,
> which was intended to undermine the administration and
> operation of the Capitol Police.
>
> An investigation will be conducted during the course of
> this suspension and appropriate action will be taken at its
> conclusion.  Such action may be disciplinary suspension,
> removal from employment, or reinstatement retroactive to
> the beginning of suspension.
>
> Your rights in this personnel action are explained in
> Article 26 of the Fraternal Order of Police Agreement, as well
> as Parts II and III of Appeal Request Form, SCSC-4112, and in

8

the extracts from the Civil Service Act, copies of which are attached.

Your benefits may be affected by this action. Please contact Shirley Sunkel, Chief of the Benefits Division, at (717) 783-3044 regarding this matter.

Should you be experiencing a personal problem that you feel may have contributed to your actions, you are encouraged to contact the State Employee Assistance Program (SEAP), which provides confidential assistance. You can contact SEAP directly by dialing the toll free number, 800-692-7459 (TDD# 800-824-4306). This number is in service 24 hours a day. SEAP will not disclose information to the workplace without your consent.

Until you receive further notice from Robert Dillard, you are not permitted to report to your position as Capitol Police Officer, Patrolman, in the Bureau of Police and Safety, or enter the workplace without prior authorization. Should you believe that it is necessary to seek such authorization, please contact Mr. Dillard at (717) 787-9013 to make appropriate arrangements. The following items of Commonwealth property that are in your possession are to be returned to Mr. Dillard immediately: weapon, keys and Commonwealth identification card.

If you have any questions concerning this letter, please contact Connie A. Tennis, Chief of the Division of Labor Relations and Training, at (717) 705-6920. [Ex. J-2, p. 2].

On July 28, 2006, the Union filed a grievance contesting the Grievant's

suspension without pay:

> On or about Tuesday, July 18, 2006, the Grievant, Officer Schmidt, was notified of a suspension without pay pending internal investigation into a complaint concerning misconduct. The suspension without pay was effective July 18, 2006.

9

There is no just cause for this suspension. The Grievant was not charged with any crime for which immediate suspension without pay is authorized under the Governor's Code of Conduct. Prior to implementation of the suspension without pay, the Employer offered the Grievant no pre-deprivation notice or opportunity to be heard as required under the Administrative Agency Law, 2 Pa. C.S. §101 et seq. and U.S. Const. Amend. 14. The Grievant has not been served with any administrative specification of charges. [Ex. J-2, p. 3].

On September 12, 2006, Mark A. Grab, Bureau of Labor Relations, denied

the grievance:

This is in response to the above grievance alleging a violation of Article 26 (Discharge, Demotion, Suspension and Discipline) of the Commonwealth/FOP Lodge #85 Agreement. Specifically, the Union contends the Employer lacked just cause to suspend the grievant pending an investigation of allegations of misconduct. The Union seeks all appropriate relief.

It is the Commonwealth's position that the action taken by the Department of General Services is substantively not arbitrable as it is not an action that arises from the application, interpretation or meaning of the Collective Bargaining Agreement. There has been no final adjudication of this matter and therefore no formal disciplinary action has been taken against the grievant. Therefore, we believe this grievance to be premature. In placing the grievant in a suspension pending investigation status, the Employer took appropriate administrative action in response to the nature of the specific allegations involved in this matter.

Furthermore, it is the Commonwealth's position that the allegations raised by the Union concerning a violation of Administrative Agency Law, 2 Pa. C.S. §101 et seq. and United States Constitutional Amendment 14, are also not substantively arbitrable. The Agreement clearly establishes

10

that, "each case shall be considered on its merits and the collective bargaining agreement shall constitute the basis upon which the decision shall be rendered." Without prejudice to that position, the administrative action giving rise to the instant matter is not adjudicatory. Suspension pending investigation is not representative of a final order, decree, decision, determination or ruling by the agency impacting on the grievant's personal or property rights, privileges, immunities, duties, liabilities, or obligations. Finally, no law has been made or enforced which abridged the privileges or immunities of the grievant. The grievant has not been, nor will he be, deprived of his right to proper due process.

For the above reasons, we find the Union's grievance in this matter to be substantively non-arbitrable and premature. Furthermore, we find no evidence at this time that would support the allegation of a violation of the Agreement. Therefore, this grievance is denied. [J-2, p. 4-5].

On September 20, 2006, Union attorney Sean T. Welby notified the Bureau

of Labor Relations of the Union's demand for arbitration. [Ex. J-2, p. 6].

On November 1, 2006, Superintendent Richard S. Shaffer advised Welby

attorney that the Grievant was ordered to appear for an interview:

Please accept this letter as documentation that, as per our previous telephone conversation, Capitol Police Officers Michael Schmidt and Kenneth Shaffer are hereby ordered to present themselves for interviews by representatives of the Office of Inspector General.

As per Bureau policy, these Officers must be truthful in their responses and must fully cooperate with the investigation.

In an effort to assure that these Officers are properly advised of their Garrity Rights, enclosed you will find blank copies of a

11

generalized Garrity Rights form. I would ask that both Officers
sign and date these forms and that a witness do the same.
Please return these forms to my office as soon as possible so
we may proceed with the interviews.

Please contact me should you have any questions.

Your cooperation in this matter is greatly appreciated. [Ex. J-
2, p. 7].

On November 14, 2006, the Grievant signed the Garrity Rights form and

the Office of Inspector General conducted an investigatory interview.

The Union submitted the unresolved dispute to binding arbitration, and on

November 2, 2006, the Pennsylvania Bureau of Mediation advised me that the

parties selected me as the impartial arbitrator of this matter.

12

## SUMMARY OF THE ARGUMENTS

The Commonwealth contends that the grievance is not substantively arbitrable because an administrative suspension pending investigation Is not considered to be formal disciplinary action subject to the terms of the parties' Agreement:

> By its very nature, a suspension pending investigation is not a final adjudication. Accordingly, it must be concluded that, to-date, no formal disciplinary action has been taken against Schmidt, and, therefore, there has been no action arising from the application, interpretation or meaning of the collective bargaining agreement. The Commonwealth has merely taken an appropriate administrative action in response to the nature of the specific allegations involved in this matter. [Employer Brief, p. 5].

Likewise, the Commonwealth maintains that alleged violations of law (i.e. violations of the Pennsylvania Administrative Agency Law and the United States Consistution) are not substantively arbitrable. The Commonwealth emphasizes that arbitral authority is limited to the terms of the collective bargaining agreement. For all of the reasons above, the Commonwealth claims the grievance is not arbitrable and must be denied in its entirety.

13

Assuming the grievance to be arbitrable, the Commonwealth contends

that the "just cause" standard provided in the parties' Agreement does not

apply in this matter:

> [T]he arbitrator must determine the validity of the suspension
> of [the Grievant], pending the outcome of an external
> administrative investigation into his actions of July 15, 2006.
> The collective bargaining agreement, in Section 1 of Article
> 26 (Joint Exhibit 1), does require just cause for a disciplinary
> action. However, in the situation presented by this case, the
> requisite just cause analysis is not the traditional one
> espoused by the FOP. Rather, in circumstances such as this,
> where alleged serious misconduct by an employee is being
> actively investigated, the Commonwealth need only establish
> that it acted reasonably in suspending the employee
> pending the outcome of the investigation. The question thus
> becomes not whether the Commonwealth met the
> traditional just cause standards, but whether the
> Commonwealth had legitimate reason to suspect the
> grievant engaged in the alleged misconduct and whether
> that misconduct would potentially have an adverse effect on
> the ability of the Commonwealth agency to perform its core
> functions. [Employer Brief, p. 6-7].

In this light, the Commonwealth maintains that the preliminary information

Rapak collected provided the DGS with a legitimate reason to suspect that the

Grievant engaged in the alleged misconduct. The Commonwealth indicates

the DGS reasonably concluded it "could no longer trust that [the Grievant]

could continue to perform the duties of a sworn law enforcement officer" and

"had no choice but to suspend [the Grievant] until the allegations suggested by

the preliminary information could be fully investigated." [Employer Brief, p. 7-8].

14

The Commonwealth asserts that it provided the Grievant with sufficient

due process under the circumstances of this matter. Citing Gilbert v. Homar, 520

U.S. 924 (1997), the Commonwealth refers to three (3) factors that must be

balanced when considering whether due process was fulfilled:

> First, the private interest that will be affected by the official
> action; second, the risk of an erroneous deprivation of such
> interest through the procedures used, and the probable
> value, if any, of additional or substitute procedural
> safeguards; and finally, the Government's interest."
> [Employer Brief, p. 9, citing Homar at 932].

The Commonwealth indicates a temporary unpaid suspension was appropriate

given the allegations of serious misconduct against the Grievant who "occupies

a position 'of great public trust and high public visibility.' Homar at 932."

[Employer Brief, p. 10]. As to the risk of erroneous deprivation of the Grievant's

private interest and the probative value of procedural safeguards, the

Commonwealth supports its position as follows:

> The Homar Court found that the university had "no
> constitutional obligation to provide respondent with a
> presuspension [sic] hearing" because it had reasonable
> grounds to believe the truth of the charges. Id. at 933. In
> Homar, those reasonable grounds were established by the
> underlying criminal charges.   In the instant case, the
> reasonable grounds are established by the preliminary
> information obtained by Rapak, which were not refuted by
> the grievant, who did not take the stand in his own defense.
> [Employer Brief. p. 10].

15

The Commonwealth notes that it intends to provide the Grievant with "an adequately prompt post-suspension hearing." [Employer Brief, p. 10]. The Commonwealth emphasizes that the Grievant's suspension pending investigation comports with the statutory standard set forth in Section 803 of the Pennsylvania State Civil Service Act. Based upon the above, the Commonwealth claims it did not violate the Grievant's right to due process.

For all of the reasons above, the Commonwealth maintains that the DGS did not violate the parties' Agreement by suspending the Grievant without pay pending the outcome of an external administrative investigation. The Commonwealth, therefore, requests that the grievance be denied and dismissed.

The Union disputes the Commonwealth's claim that the grievance is not substantively arbitrable. The Union maintains that there is a presumption of arbitrability "unless it may be said with positive assurance that an arbitration clause is not susceptible of an interpretation that covers the asserted dispute." [Union Brief. p. 5 citing Beatrice/Hunt Wesson, Inc., 16 LAIS 1060 (1989)]. The Union claims that the "just cause" provision contained in Article 26 Section 1 applies in this matter because it sets forth the standard with which the Commonwealth must comply when suspending a Capitol Police officer. According to the Union, the Commonwealth's administrative suspension of the

16

Grievant falls within the type of disciplinary action that requires the just cause protection of Section 1.

The Union asserts that the Commonwealth cannot rely upon Section 803 of the Civil Service Act:

> The Commonwealth's reliance upon Section 803 of the Civil Service Code is entirely misplaced. When it entered into the collective bargaining agreement, the Commonwealth did not insist upon retaining the applicability of Civil Service Code provisions in dealing with its Capitol Police employees. Rather, it agreed to restrict itself solely to the "just cause" standard for *all* suspensions challenged by the grievance and arbitration process, and to give employees the choice of invoking that "just cause" protection, or that found in the Civil Service Code. In doing so, it surrendered its right to invoke those provisions of the Civil Service Code which do not require it to show just cause for suspension. [Union Brief, p. 7 (footnotes omitted)].

> The Commonwealth's theory is based not on the collective bargaining agreement, but rather on the Civil Service Code. It essentially seeks to have the arbitrator add Section 803 of the Civil Service Code to Article 26, Section 1. However, the arbitrator does not have jurisdiction to do what the Commonwealth asks. [Union Brief, p. 8].

Assuming, arguendo, that Section 803 of the Civil Service Act applies, the Union points out that the Grievant's suspension should have been limited to sixty (60) days:

17

> Even if Section 803 of the Code were applicable, it would
> only permit the Grievant's suspension for 60 days. The
> assignment of the Inspector General to perform the internal
> administrative investigation does not enlarge this period. The
> Inspector General is not only not an "outside agency", it is not
> even an "agency" at all, and has no legal existence
> separate from that of the Governor. Van Hine v.
> Commonwealth Department of State, 856 A.2d 204 (Pa.
> Cmwlth. 2004). Only an employer may invoke the Garrity
> right to compel employees to submit to an investigatory
> interview. That was done here on November 1, 2006, long
> after this grievance was filed. [Union Brief, p. 8-9, footnote 7].

The Union contends the Commonwealth failed to afford the Grievant with

due process:

> In matters of suspension arising out of the Capitol Police
> collective bargaining agreement, the Commonwealth has
> voluntarily agreed not to suspend unless it can establish just
> cause. Commonwealth of Pennsylvania and Pennsylvania
> State Troopers Association (Stowell), No. 89-C7-0093
> (Stoltenberg, 1990). An essential part of the just cause inquiry
> the Commonwealth has agreed to includes an examination
> of whether the Grievant was afforded due process, both
> contractual and constitutional, during the process.
> Commonwealth Office of Attorney General and Attorney
> General Investigators Association, No. 00-DD-74 (Cooper,
> 2000).
>
> The most fundamental due process elements
> implicated in a suspension from employment are notice of
> the charges sufficient to and an opportunity to be heard.
> With respect to the former, the notice requirement entails a
> list of administrative charges "framed in a manner which
> enables the employee to discern the nature of the charges
> and adequately to prepare a defense". City of Harrisburg v.
> Pickles, 492 A.2d 90, 95. This requirement is fundamental.
> "[T]his is the way that we have handled these cases in the

18

past" is not a poor excuse; rather, it is *no excuse at all for a constitutional infirmity*". Id. At 95. (Emphasis in original).

As regards the latter, the opportunity to be heard usually entails a full due process hearing before the officer may be suspended. However, in adopting the principles of pre-deprivation process outlined in Loudermill v. Cleveland Board of Education, et al., 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the Courts of the Commonwealth have recognized that under extreme circumstances, the employer's interest in immediately removing an employee from the workplace would outweigh the employees interest in full pre-deprivation hearing. Delaware County Lodge No. 27 v. Township of Tinicum, 908 A.2d 362 (Pa. Cmwlth. 2006). Accordingly:

> [T]he pretermination "hearing," though necessary, need not be elaborate.... Here, the pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions-essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action....
>
> ... The opportunity to present reasons, either in person or in writing, why the proposed action should not be taken is a fundamental due process requirement.

Loudermill., 470 U.S. at 545-546, 105 S.Ct. 1487, 84 L.Ed.2d at 506.

Here, there was no notice of charges, nor any opportunity to respond prior to suspending the Grievant without pay. Even if Section 803 of the Civil Service Code were applicable to this matter, reliance on that statutory provision as authority to suspend does not obviate the basic requirements of due process at its most fundamental level when that authority is utilized.

Because the Commonwealth did not afford the Grievant *any* pre-deprivation process whatsoever, it cannot be found to have established just cause for its suspension of the Grievant. Exeter Township and FOP Lodge 36 (Stout),

19

(Schwartz, 1998); Manheim Township and Manheim Township Police Association (Billiter), AAA No. 14 390 00316 06 (O'Connell, 2006); Police Employees of Silver Spring Township and Silver Spring Township (Potteiger), AAA Case No. 14 390 1714 05 (De Truex, 2005). [Union Brief, p. 9-11 (footnote omitted)].

Shifting focus from its due process concerns to the merits of the grievance, the Union contends the Commonwealth failed to "prove the substantive aspects of just cause" in suspending the Grievant indefinitely pending the results of an internal administrative investigation:

Here, the only proof offered to the arbitrator by the Commonwealth in support of its burden was that the Grievant made a dispatch entry into the METRO system when an off-duty officer made an allegation of criminal activity on the part of Mr. Shaffer, Mr. Dillard and Mr. Rapak. While Ms. Tennis and Mr. Greene asserted that the Grievant had left his post, and that the Grievant did not have the authority to make the entry into the computer system, both admitted that they had no personal knowledge that these acts or omissions occurred, and simply relied on what they were told by either Mr. Rapak or Mr. Shaffer at the meeting held on July 18, 2006. Significantly, neither Mr. Rapak, nor Mr. Shaffer, testified to either of these things. Moreover, Mr. Shaffer admitted that under Capitol Police Regulations, all requests for police services would have to be entered into the METRO system in the form of a dispatch notice.

The Commonwealth's failing in this regard is that it did not establish that the Grievant violated any rule, regulation or policy in entering the dispatch notice. The Commonwealth did not provide the arbitrator with its rules, regulations, or policies concerning access to or reporting on the METRO system, and in no way implicated anything other than an entry occurred and the Grievant put it there. Mr. Shaffer went so far as to agree that if an officer were to be given a

20

complaint of criminal misconduct on anyone's part, it would have to be documented, and investigated.

So all we are left knowing from the Commonwealth's proof Is that the Grievant made the computer entry. What we still do not know, and what the Commonwealth has never offered, Is how that forms the basis of any misconduct, let alone misconduct rising to the level of just cause. This does not meet the level of proof the Commonwealth committed itself to In the collective bargaining agreement, and the grievance should be sustained. [Union Brief, p. 11-12].

For all of the reasons above, the Union requests that the grievance be sustained, that the Grievant be reinstated to a pay status, and that back pay be awarded to July 18, 2006.

21

## DISCUSSION

The initial issue for determination is the Commonwealth's claim that the grievance is not arbitrable. After review of the Commonwealth's basis to support this claim, I find that it is without merit. Article 26, Section 1 of the Agreement does not allow the Commonwealth to "demote, suspend, discharge or take any disciplinary action against an officer without just cause." In this instance, there is no dispute that the Commonwealth suspended the Grievant without pay on July 18, 2006 pending investigation. While the record reflects neither the details of that investigation nor its outcome, the investigatory interview did not take place until November 14, 2006. Almost four (4) full months elapsed between these events. The fact that the Grievant was suspended without pay at least through this time period supports the Union's claim that the Commonwealth's action may have constituted a disciplinary action. Applying the appropriate standards for determining whether a grievance can proceed before an arbitrator, the Commonwealth has not established that the terms of the Agreement cited by the Union are not susceptible to an interpretation that the suspension of the Grievant without pay constituted a disciplinary action and, if so, whether the Commonwealth acted with or without just cause. Thus, under the language set forth in Article 26, Section 1 the Union may advance its claim on the merits in this forum. I now turn to the merits of the grievance.

22

The first issue in addressing the merits of the grievance is whether the suspension was a disciplinary action. Special Investigator Rapak was advised that someone entered information in the METRO dispatch system that could have lead to the detainment of himself, the Superintendent, and the Deputy Superintendent. Rapak reacted to this by initiating a preliminary investigation. During his preliminary investigation, Rapak obtained information regarding the alleged incident and shared the information with the Superintendent. Rapak and Superintendent Shaffer proceeded to meet with Commonwealth representatives Tennis and Green to share in the gathered information. An assessment was made that they believed the Grievant entered some of the information into the METRO dispatch system, an act that, if proven, was considered to be grounds for disciplinary action. Based upon the information Rapak gathered during his preliminary investigation, and the discussions that ensued during that meeting, the Commonwealth suspended the Grievant without pay pending an investigation. At this point, no charges were proffered against the Grievant nor was he provided with an opportunity to respond to the Commonwealth's decision to suspend him without pay.

The Grievant's suspension without pay was a direct response to the allegations entered in the METRO dispatch system against the Superintendent, the Deputy Superintendent, and Special Investigator Rapak. The Commonwealth's conclusion, based largely upon Special Investigator Rapak's

23

preliminary investigation, caused it to believe that it was the Grievant who made some of the entries. The Grievant was then suspended without pay pending an investigation. The Commonwealth asserts that a suspension without pay pending investigation is not discipline because it is not a final adjudication. However, Section 1 is absent of language that requires a final adjudication to take place before a Capitol Police Officer is entitled to just cause protection. Section 1 simply requires that when some form of disciplinary action is to be taken against an officer, just cause is the standard of review. In this instance, the suspension of the Grievant, his loss of pay and benefits for almost four (4) months pending Investigation must be considered an adverse action against the Grievant that constitutes an act of discipline.

I next turn to whether the Commonwealth violated Article 26 Section 1 of the Agreement. I again note that there must be Just cause for a disciplinary action. The issue here is not whether final disciplinary action had been taken but whether the Commonwealth had just cause to place the Grievant in an unpaid status. The Commonwealth clearly has the authority to suspend the Grievant without pay pending an investigation but this does not grant the Commonwealth the authority to do so without some opportunity for the Grievant to respond to the Commonwealth's position that the Grievant's conduct had risen to a level warranting a suspension without pay. Under the facts of this case, it would have been reasonable for the Commonwealth to

24

provide the Grievant with an opportunity to be heard either before his suspension was effectuated or shortly thereafter, regardless of whether the investigation was considered to be "internal" or "external". The Commonwealth's basis for the Grievant's suspension was the information that Special Investigator Rapak learned and subsequently provided to Tennis and Green at the July 18, 2006 meeting. It is noted that the decision to suspend the Grievant was based upon information that was collected and presented by the individuals whose names and alleged conduct were listed in the METRO dispatch system. Even if this were not the case, the Commonwealth, under its just cause obligation, was required to provide the Grievant with some opportunity to be heard prior to being placed on unpaid suspension status and kept in such status for four (4) months before conducting an investigatory interview. I do not conclude that a full evidentiary hearing was necessary to satisfy this obligation. Nor do I find that the Commonwealth was obligated to prove the allegations against the Grievant before placing him on suspension without pay pending an investigation. In this instance, the Grievant was suspended without pay, without any notice of charges or the potential basis for charges, at minimum. The Commonwealth has not established reasonable grounds for the suspension nor extreme circumstances that would justify a suspension without pay without first providing some opportunity for the Grievant to be heard.

25

For the reasons above, I find the Commonwealth did not have just cause

to suspend the Grievant without pay pending the investigation. As a remedy,

the Commonwealth shall provide the Grievant with full back pay, seniority and

benefits from July 18, 2007, the date of his initial suspension to November 14,

2006, the date upon which the Grievant signed the Garrity Rights form and

became the subject of an investigatory interview.

## AWARD

The grievance is arbitrable.   The suspension without pay under the circumstances of this case constitutes a form of disciplinary action that permits review under Article 26, Section 1. The Commonwealth did not have just cause to suspend the Grievant without pay pending an investigation.   The Commonwealth shall provide Grievant with full back pay, seniority, and benefits from July 18, 2006 through November 14, 2006.

Dated:      April 18 , 2007
            State College, PA            Robert C. Gifford

Commonwealth of Pennsylvania      }
County of Centre                  }ss:

On this 18ᵗʰ day of April, 2007, before me personally came and appeared Robert C. Gifford to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed same.

Beverly J. Hoone

Commonwealth Of Pennsylvania
Notarial Seal
Beverly J. Hoover, Notary Public
State College Boro, Centre County
My Commission Expires May 24, 2007
Member, Pennsylvania Association Of Notaries

27

# *Schmidt v. Creedon, et al.*
# **No. 1:09-CV- 0323 (M.D.Pa.)**

# **EXHIBIT J**
*March 2, 2007 Notice of Pre-Disciplinary Conference*





**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF GENERAL SERVICES**
**HARRISBURG**

March 2, 2007

Mr. Michael C. Schmidt
18 Red Barberry Drive
Etters, PA  17319

Dear Mr. Schmidt:

This is to advise you that an investigation is presently being conducted into the following allegations concerning your conduct as an employee of the Department of General Services. The charge is as follows:

o Specifically, on July 15, 2006, you left your assigned duty post without permission, entered the IMCS area without authorization, and entered information without authorization into the METRO system which was intended to undermine the administration and operation of the Capitol Police. In addition, after learning that Sgt. Bistline removed the information from the METRO system, you became loud, argumentative and insubordinate towards Sgt. Bistline, used profanity and disrupted the workforce.

A pre-disciplinary conference has been scheduled for **March 9, 2007 at 1:30 p.m.** in Room 512 North Office Building. The purpose of the conference is to present you with an opportunity to discuss the allegations and to respond in detail to the charges listed above. At the conference, you will be requested to provide your account of the incidents being investigated. You have the right to have union representation at the meeting.

Discipline may or may not be imposed depending on the facts gathered during the investigation. You will be notified, in writing, as soon as possible of the final outcome of the investigation whether or not disciplinary action is taken.

Please contact me at 717-705-6920 upon receipt of this letter to confirm your attendance at this conference.

Sincerely,

Connie A. Tennis, Chief
Division of Labor Relations and Training
Bureau of Human Resources

*SENT CERTIFIED, RETURN-RECEIPT REQUESTED and REGULAR MAIL*

## *Schmidt v. Creedon, et al.*
## No. 1:09-CV- 0323 (M.D.Pa.)

# EXHIBIT K
*March 14, 2007 Notice of Termination*

EXHIBIT
K



**COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF GENERAL SERVICES
HARRISBURG**

March 14, 2007

Mr. Michael C. Schmidt
18 Red Barberry Drive
Etters, PA  17319

Dear Mr. Schmidt:

This is to advise you that you are hereby terminated from your position as a Capitol Police Officer (Patrolman), regular Civil Service status, in the Bureau of Policy and Safety, effective March 15, 2007, while on suspension pending investigation which began on July 18, 2006.

The reason for this termination is:

o   Specifically, on July 15, 2006, you left your assigned duty post without permission, entered the IMCS area without authorization, and entered information without authorization into the METRO system which was intended to undermine the administration and operation of the Capitol Police.  In addition, after learning that Sgt. Bistline removed the information from the METRO system, you became loud, argumentative and insubordinate towards Sgt. Bistline, used profanity and disrupted the workforce.  These actions violated numerous provisions and procedures of the Capitol Police Duty Manual, which you are bound by and expected to follow.

A pre-disciplinary conference was held on March 9, 2007, and the response you provided was unacceptable.  Previous discipline includes a three-day suspension with a final warning issued on June 14, 2004 for sending inappropriate e-mails and using profanity when referring to members of the Legislative Black Caucus.

As a result of this action, you should contact the State Employees' Retirement System (SERS), Harrisburg office, to discuss the status of your retirement account.  Their telephone number is 1-800-633-5461.

Your Commonwealth of Pennsylvania health care benefits provided by the Pennsylvania Employee Benefits Trust Fund (PEBTF) ends as of the date of your separation.  For information on options to continue your medical coverage, you should contact PEBTF at 1-800-522-7279.

Your Commonwealth Group Life Insurance Coverage ceases 31 days after the date of your separation.  As a result, you will receive a conversion notice from the Prudential Insurance Company.  During your 31-day period following your separation or 15 days from the date of the conversion notice, you may apply for an individual life insurance policy in an amount not to exceed the amount of your lost coverage, with no physical examination required.  If you are permanently and totally disabled, you may apply for Disability Life Insurance to continue your coverage.  If you believe you are eligible for disability coverage or if you wish to apply for conversion, please contact the Prudential Customer Service Department at 1-800-893-7316 for assistance.

## **EXTRACTS FROM CIVIL SERVICE ACT**

Section 807. Removal. - No regular employee in the classified service shall be removed except for just cause.

Section 905a. Prohibition of discrimination. - No officer or employee of the Commonwealth shall discriminate against any person in recruitment, examination, appointment, training, promotion, retention or any other personnel action with respect to the classified service because of political or religious opinions or affiliations because of labor union affiliations or because of race, national origin, or other non-merit factors.

Section 951. Hearings. - (a) Any regular employee in the classified service may, within twenty calendar days of receipt of notice from the appointing authority, appeal in writing to the commission. Any[1] permanent separation, suspension for cause, furlough or demotion on the grounds that such action has been taken in his case in violation of the provisions of this act, upon receipt of such notice of appeal, the commission shall promptly schedule and hold a public hearing.

(b) Any person who is aggrieved by an alleged violation of section 905.1 of this act may appeal in writing to the commission within twenty calendar days of the alleged violation. Upon receipt of such notice of appeal, the commission shall promptly schedule and hold a public hearing.

(c) All final decisions of the commission shall be reviewable in accordance with the laws.

(d) Notwithstanding any other provisions of this section, the commission may, upon its own motion, investigate any personnel action taken pursuant to this act and, in its discretion, hold public hearings, record its findings and conclusions, and make such orders as it deems appropriate to assure observance of the provisions of this act and the rules and regulations thereunder.

---

[1]As written in enrolled bill